UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| ARLA CRANE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:24 CV 03 CDP |
| | ) |
| ARCHER DANIELS MIDLAND CO., | ) |
| | ) |
| Defendant. | ) |

# **MEMORANDUM AND ORDER**

Plaintiff Arla Crane bred rabbits and sold them for profit to individuals for various purposes. She claims that defendant Archer Daniels Midland Co.'s (ADM's) rabbit feed that she purchased and fed to her rabbits beginning in December 2022 was contaminated with vomitoxin and caused her rabbits to become sick and eventually die. She brings this action under Missouri law asserting claims of breach of implied warranty (Count I) and negligence (Count II).[1] Because Crane cannot produce sufficient evidence that ADM's rabbit feed caused injury and death to her rabbits, I will grant ADM's motion for summary judgment on the claims.

---

[1] The Court previously dismissed an additional claim brought under the Missouri Merchandising Practices Act (Count III) for failure to state a claim. (*See* ECF 39, Memo. & Ord, May 31, 2024.)

## Legal Standard

Summary judgment is appropriate if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Meyer v. McKenzie Elec. Coop., Inc.*, 947 F.3d 506, 508 (8th Cir. 2020); Fed. R. Civ. P. 56(a).  The moving party bears the burden of informing the Court of the basis of its motion and demonstrating the absence of an issue for trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Once a motion is properly made and supported, the nonmoving party must either proffer evidence in the record that demonstrates a genuine issue of material fact or show that the moving party's proffer does not establish the absence of a genuine dispute.  Fed. R. Civ. P. 56(c)(1); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Conseco Life Ins. Co. v. Williams,* 620 F.3d 902, 910 (8th Cir. 2010); *Howard v. Columbia Pub. Sch. Dist.,* 363 F.3d 797, 800-01 (8th Cir. 2004).

In determining a motion for summary judgment, I consider only those facts that can be supported by admissible evidence.  Fed. R. Civ. P. 56(c); *Woods v. Wills*, 400 F. Supp. 2d 1145, 1175-76 (E.D. Mo. 2005).  Testimony that would not be admissible is ignored.  *Shaver v. Independent Stave Co.*, 350 F.3d 716, 723 (8th Cir. 2003).  Accordingly, speculation, personal opinion, and legal conclusions are not "facts" upon which a party may rely for summary judgment purposes.  *See Benford v. Grisham*, No. 1:18CV5 JMB, 2020 WL 569871 (E.D. Mo. Feb. 20,

2020).  *See also* Fed. R. Civ. P. 56(c)(4) (a declaration used to support or oppose a motion for summary judgment must be made on personal knowledge and set out facts that would be admissible in evidence).

I view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in her favor.  *Scott v. Harris,* 550 U.S. 372, 379 (2007).  A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  The substantive law determines which facts are critical and which are irrelevant.  *Id.*  Only disputes over facts that might affect the outcome will properly preclude summary judgment.  *Id.*

## Evidence Before the Court on the Motion

The following recitation of facts is from my independent review of the record in the case as well as from facts asserted in ADM's Statement of Uncontroverted Material Facts that Crane admits or does not refute.  (ECF 73.)

Beginning in 2017, Crane was engaged in the business of raising and breeding rabbits and selling them for profit.  Crane housed the rabbits in about 80 cages in a 13-by-60-foot barn.  For several years, Crane fed ADM's Pen Pals® Professional Rabbit 18 feed to the rabbits.  ADM markets and labels Pen Pals® as a "complete feed" for rabbits, with specific feed requirements, measurements, and instructions included on the label.  (ECF 73-2.)  Crane purchased 20 bags of Pen

Pals® on December 20, 2022 ("Feed"),[2] and began feeding the rabbits from those bags on December 26, 2022. (ECF 69-1, Crane Dep. at dep. pp. 22, 24; ECF 69-3 at hp. 12.)[3] Crane attested that the Feed constituted 100% of her rabbits' diet. (ECF 73-1, Crane Affid. at ¶ 6.)

Crane testified at her deposition that the rabbits began showing signs of illness on December 29, 2022, with bloat, reduced appetite, and mucous in their stool.[4] In mid-January 2023, Crane began to suspect that the Feed was causing the adverse health effects. She discontinued the Feed on January 24 and began feeding with a "new batch" that she had just purchased. (ECF 69-1 at dep. pp. 26-27.) In the meantime, Crane administered the antibiotic LA-200 to rabbits that had pneumonia-like symptoms. She purchased the antibiotic at a local farm store. She did not take any sick rabbit to a veterinarian before starting the antibiotic; nor did a veterinarian come to her facility to examine any sick rabbit. (*Id.* at dep. pp. 27-29.)

Later in January 2023, Crane contacted the veterinary laboratory at the University of Missouri (MU) and spoke with Dr. Stan Casteel, a toxicologist. Dr.

---

[2] For purposes of this Memorandum and Order, the capitalized word "Feed" refers to the ADM feed that Crane purchased on December 20, 2022, which is the subject of this litigation.

[3] To the extent a single exhibit contains several documents, I will refer to the page number identified in the ECF header (*i.e.*, "hp." or "hpp.") when citing to that document.

[4] In a complaint filed with ADM on February 14, 2023, Crane reported that her rabbits began dying in November 2022, and that about 200 rabbits died from mid-November to mid-February. (ECF 69-4 at hpp. 48-49, 63-64.) Crane reported in that complaint that the dead rabbits ranged in age from birth to three years. (*Id.* at hp. 64.)

Casteel told Crane that there was something wrong with the rabbits and asked that she send some rabbits to the vet lab for testing.  Crane declined because of the presence of antibiotics in the rabbits.  She also expressed her adamance to Dr. Casteel that the problem with her rabbits was the Feed.  (ECF 69-1 at dep. pp. 26-27.)  Crane testified that Dr. Casteel advised her to continue treatment with antibiotics.  (*Id.* at dep. pp. 27-28.)

On February 3, 2023, Crane stopped regularly giving the Feed to the rabbits, and she removed and destroyed what Feed remained in the feeders.  She retained two unopened bags of Feed, however, as well as half of an opened bag.  (ECF 69-1 at dep. pp. 22-24.)

At Dr. Casteel's request, Crane sent four samples of Feed to the MU vet lab for testing.  The samples were taken from one unopened bag of Feed that had not yet been fed to any rabbit.  (ECF 69-1 at dep. pp. 79-80.)[5]  Mycotoxin screening conducted by the MU lab on February 10 showed the presence of vomitoxin at 5.3 parts-per-million (ppm) in one sample, 2.9 ppm in another sample, and none detected in the other two samples.[6]  Regarding the 5.3 ppm sample, Dr. Casteel

---

[5] Crane sent four Feed samples to the MU vet lab.  She later sent a fifth sample from the same bag to the veterinary laboratory at Iowa State University.  She also provided a sample to an ADM representative.  None of the Feed that was in the feeders or given to the rabbits on or before February 3 was saved or tested.  (ECF 69-1 at dep. pp. 79-80.)

[6] Vomitoxin is in a class of mold-produced toxins known as mycotoxins.  U.S. Food & Drug Admin. (2024), *Mycotoxins*, available at https://www.fda.gov/food/natural-toxins-food/mycotoxins (last reviewed Oct. 27, 2025).

noted on the lab report that "At this level, one would expect some adverse effects on gastrointestinal function and feed refusal." (ECF 69-3 at hp. 15.)[7]

Crane also euthanized three rabbits and sent them to the MU vet lab for necropsies. The February 14 necropsy report noted that all rabbits had fecal-stained paws and limbs. Upon examination, the vet lab found all rabbits to have varying degrees of pneumonia and coccidia oocysts,[8] with parasite migration and systemic infectious process suspected in Rabbits 2 and 3, respectively. (ECF 69-3 at hpp. 8-10.)

In late February 2023, Crane euthanized two more rabbits and sent them to the MU vet lab for necropsies. The necropsy report dated February 28 showed that Rabbit 1 had "rare intraepithelial coccidial macrogamonts" in the small intestine with a fecal smear showing coccidia oocysts, and that Rabbit 2 had "hepatic coccidiosis and severe inflammation." (ECF 69-3 at hp. 3.) The report also stated that "Coccidiosis is an important cause of disease and mortality in commercial rabbitries, with weanling rabbits most commonly affected." (*Id.*) Dr. Casteel agreed that coccidiosis is an important cause of mortality in commercial rabbitries

---

[7] Crane testified that Dr. Casteel also informed her in an email that she must change her feedstuff "immediately," which she handwrote on the MU lab report before sending it to her attorney. (ECF 69-1 at dep. pp. 129-31.) She also testified that she accidentally deleted that email and was unable to retrieve it. (*Id.* at dep. pp. 121-22.)

[8] Coccidia are parasites. (ECF 69-2, Casteel Dep. at dep. p. 15.)

to some degree. (ECF 69-2 at dep. p. 13.)

Crane later euthanized three more rabbits and sent them to the MU vet lab for necropsies. Those necropsy reports dated March 11 showed moderate to marked coccidia in the feces, with "extensive granulomas . . . suggestive of a widespread infectious process, most likely associated with the coccidia identified." The vet lab rendered a final diagnosis of coccidiosis. (ECF 69-3 at hpp. 4-5.)[9]

On March 20 and 22, 2023, upon Crane's request that he review the necropsy reports, local veterinarian Dr. Charles Lehenbauer informed Crane of the following: 1) that he thought coccidiosis was the real problem, given the reports being very suggestive of that in every case; 2) that the coccidiosis appeared to be more the hepatic form rather than the enteric form, which was likely why the symptoms were ongoing; 3) that cleaning the environment alone without aggressive systemic treatment would not help the rabbits get better, particularly with the hepatic form of coccidiosis; 4) that the mild to moderate level of vomitoxin found in the Feed sample would contribute to digestive upset but not cause it; 5) that the necropsy reports do not indicate toxicity; and 6) proving that vomitoxin enhanced some coccidia effects would be difficult without diagnostic evidence, "especially in a species that vomitoxin toxicity isn't normally seen much

---

[9] Notably, although Crane attests that her rabbits' diet consisted of 100% Feed (ECF 73-1 at ¶ 6), the necropsy reports of these rabbits showed that all had grass or hay in their stomachs. (ECF 69-3 at hpp. 4-5.)

in." (ECF 69-3 at hp. 13.)[10]

In late March 2023, Crane euthanized three more rabbits and sent them, the fifth Feed sample, and a urine specimen to the Veterinarian Diagnostic Laboratory at Iowa State University (ISU). (ECF 69-1 at dep. p. 73.) Before killing those rabbits, Crane deliberately fed them Feed from the sample bag that yielded positive vomitoxin results via the MU vet lab, hoping that the ISU necropsies would detect the presence of vomitoxin. (*Id.* at dep. pp. 82-83.) The ISU report dated April 24 showed that the Feed contained no mycotoxins. Necropsies of the three rabbits yielded indeterminate results for cause of illness, but the report noted that one rabbit had coccidia oocysts in the large intestine. No mycotoxins were present in the stomach contents of any rabbit. Regarding the positive toxin results as reported by the MU vet lab, the ISU lab opined that "The detected mycotoxin concentrations from the other laboratory are not at concentrations that would be expected to cause clinical complications in rabbits." The ISU lab concluded that "The cause of the reported morbidity and mortality is unlikely to have been caused by mycotoxins." (ECF 69-3 at hpp. 6-7.)

Crane testified that she was aware that coccidia were present at her rabbit farm before January 2023 because "all rabbits have coccidia to a certain extent"

---

[10] Dr. Lehenbauer was responding, in part, to Crane's email expressing her "need to figure out how to prove vomitoxin opened the doors" to other illnesses, including coccidia, and asking for his thoughts on how to achieve that. (ECF 69-3 at hp. 13.)

and eventually develop immunity.  She also testified that she was aware that coccidia can be found in fecal matter, on cages, and in soil and grass.  (ECF 69-1 at dep. pp. 40-41.)   Crane testified that she did not treat any of her kits for coccidia from December 2022 through March 2023, nor did she have a veterinarian examine them for coccidia.  She last treated her adult rabbits for coccidia in September/October 2022 as a preventative measure, using Toltrazuril.  (*Id.* at dep. pp. 30, 41.)

Beginning in early April 2023, Crane conducted her own experiment on eight live rabbits – all of which were four-to-five-week-old kits – whereby she fed four kits the Feed from the bag from which the five samples were taken (the "S" group, *i.e.*, "suspected feed"), and she fed newly purchased replacement feed to the other four kits (the "C" group, *i.e.*, "clean feed").  (ECF 69-1 at dep. p. 80.)  Crane followed no protocol for her experiment and consulted no one regarding how to conduct a proper study.  (*Id.* at dep. pp. 123-24, 130.)  Within two weeks of beginning her study, one rabbit from the C group died.  (*Id.* at dep. p. 137.)

On April 17, 2023, Crane killed two rabbits from each group and sent them to the ISU vet lab for necropsies.  (ECF 69-1 at dep. p. 137.)  The lab found clinically significant levels of coccidia organisms in all four rabbits, including multiple oocysts in the large intestine of a C-group rabbit.  (ECF 69-3 at hp. 11.)  After April 17, Crane fed the three remaining rabbits (two S-group rabbits and one

- 9 -

C-group rabbit) only "clean" feed. She euthanized them on May 18. (ECF 69-1 at dep. pp. 145-48.)

Crane testified that she had 104 adult breeding rabbits in October 2022 and that a total of 104 adult rabbits and 672 kits died because they ate what she believed was Feed contaminated with vomitoxin. Only six rabbits survived. Beginning in May 2023 and continuing thereafter, the six surviving rabbits have produced litters of kits, but Crane has chosen not to reestablish her rabbitry business given the financial strain. (ECF 69-1 at dep. pp. 9-11, 13-14.)

Crane testified that of the kits that died from December 26, 2022, to March 9, 2023, 65-percent of them died "on their own" as opposed to her killing them. (ECF 69-1 at dep. p. 69.) She did not seek veterinary care for her sick rabbits, believing that nothing could be done and given the likely high costs associated with the long process in bringing the rabbits back to a healthy state. (*Id.* at dep. pp. 99-100.)

Crane testified that she cleaned and "burned" her cages as a sanitation measure once a year and, as relevant here, last went through that process in September 2022. (ECF 69-1 at dep. pp. 65-66.) Otherwise, she regularly scraped fecal matter from the cages. (ECF 73-1, Crane Affid. at ¶ 4.) As part of preparing for her experiment in April 2023, she scrubbed the test cages and food bowls with a wire brush and rinsed with water. She did not clean the cages for coccidia, that

is, torch the cages or use ammonia. (ECF 69-1 at dep. pp. 125-26.) In May 2023, after her rabbits died, Crane cleaned all cages with industrial strength ammonia and burned the bottom of the cages. (*Id.* at dep. pp. 65-66.)

All necropsied rabbits were rabbits that Crane euthanized. None of the necropsied rabbits died of natural causes, whether by disease, illness, or otherwise. All necropsy reports cited the presence of coccidia in the rabbits, with the MU lab opining that the rabbits' conditions were suggestive of a widespread infectious process most likely associated with coccidia – "an important cause of disease and mortality in commercial rabbitries, with weanling rabbits most commonly affected"; and the ISU lab opining that the "cause of the reported morbidity and mortality is unlikely to have been caused by mycotoxins." No necropsy detected mycotoxin or cited its presence as a factor in the rabbits' conditions.

## Discussion

In this products liability case, Crane asserts negligence based on manufacturing defect, and breach of implied warranty of merchantability. The parties agree that Missouri law governs the claims in this diversity action.

To prevail on a claim of negligence, generally, under Missouri law, a plaintiff must show: that defendant had a duty to protect the plaintiff from injury; failure of the defendant to perform that duty; and injury to the plaintiff resulting from that failure. *Thompson v. Brown & Williamson Tobacco Corp.*, 207 S.W.3d

76, 98 (Mo. Ct. App. 2006); *see also Strong v. American Cyanamid Co.*, 261 S.W.3d 493, 506 (Mo. Ct. App. 2007) (product defect, negligence), *overruled on other grounds*, *Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. banc 2013). To prove a claim for breach of implied warranty of merchantability, a plaintiff must establish: "(1) that a merchant sold goods, (2) which were not 'merchantable' at the time of the sale, (3) injury and damages to the plaintiff or [her] property (4) caused proximately and in fact by the defective nature of the goods, and (5) notice to the seller of the injury." *Metty v. Shurfine Cent. Corp.*, 736 S.W.2d 527, 530 (Mo. Ct. App. 1987). *See also Mash v. Brown & Williamson Tobacco Corp.*, No. 4:03CV0485 TCM, 2004 WL 3316246, at *8 (E.D. Mo. Aug. 26, 2004).

Crane's claims of negligence and breach of implied warranty both require a causal connection between ADM's conduct and Crane's resulting injury, that is, that Crane's use of ADM's Feed directly caused or contributed to cause the claimed injuries. *See Bone v. Ames Taping Tool Sys., Inc.*, 179 F.3d 1080, 1081-82 (8th Cir. 1999). ADM argues that the undisputed evidence shows that Crane cannot meet this causation element of her claims. For the following reasons, I agree.

To establish causation under Missouri law, Crane must show that ADM's conduct was both the cause in fact and the proximate or legal cause of her injury. *Bader Farms, Inc. v. BASF Corp.*, 39 F.4th 954, 961 (8th Cir. 2022). "The cause

in fact is determined by asking whether the plaintiff's injury would not have occurred but for the defendant's conduct, and a defendant's conduct is also the proximate cause of the plaintiff's injury if the injury complained of was the natural and probable consequence of the defendant's conduct." *Strong*, 261 S.W.3d at 506 (quoting *Wright v. Barr,* 62 S.W.3d 509, 524 (Mo. Ct. App. 2001)). In a case involving multiple possible causes, a plaintiff must "exclude other causes by presenting substantial evidence that a particular cause for which defendant is liable is responsible for plaintiff's injuries." *Bone*, 179 F.3d at 1081-82 (citing *Kircher v. Purina Mills, Inc.,* 775 S.W.2d 115, 117 (Mo. banc 1989)). Although Crane is not required to exclude *all* other possible causes or prove an "absolutely positive" causal connection, her evidence of causation must be based on probative facts and not mere speculation or conjecture. *Kircher*, 775 S.W.2d at 117 (citing *Green v. Ralston Purina Co.*, 376 S.W.2d 119, 126 (Mo. 1964) (per curiam)).

"Probative facts may be established by circumstantial evidence, [but] the circumstances must point to the desired conclusion with such a degree of certainty as to make that conclusion reasonable and probable and must rise above the stature of guesswork, speculation or surmise." *Green*, 376 S.W.2d at 124. If the evidence merely establishes that the injury might have resulted from several causes, not all for which defendant is liable, the necessary causal connection lies in the "realm of conjecture and speculation," thereby defeating plaintiff's case. *Kircher*, 775

S.W.2d at 117.

Here, the evidence is insufficient to form a substantial basis upon which a reasonable jury could find that the ADM Feed Crane fed to her rabbits beginning December 26, 2022, was the cause in fact and the proximate cause of the rabbits' illnesses and deaths.

Whether the Feed would cause Crane's rabbits to sicken and die as claimed is a question of medical science that a court or jury cannot answer without aid of expert opinion. *Green*, 376 S.W.2d at 124. In this case, Crane retained Dr. Casteel as an expert to assess the effects of vomitoxin. (ECF 69-2 at dep. p. 12.) Dr. Casteel is a toxicologist and specializes in analyses of toxins in animal feed. Until this matter, he has never been involved in a case relating to rabbits. (*Id.* at dep. pp. 13, 16-17.) Based on his literature review, including FDA guidelines, Dr. Casteel opined that the presence of vomitoxin in rabbit feed at a level of 2.0 ppm or greater would be toxic to rabbits; although he acknowledged that tolerable levels of the toxin vary between species, and the literature he reviewed did not specify a limit for rabbits. (*Id.* at dep. p. 25.) He did not render an opinion that vomitoxin at the level found in the two samples of Crane's Feed would cause death. Indeed, he did not render an opinion as to the cause of death of Crane's rabbits, stating that he was not sure what caused them to die. (*Id.* at dep. p. 12.) He did not know whether or how many of Crane's rabbits died from exposure to a toxic substance or

from other causes such as other illnesses or Crane's euthanizing them. (ECF 69-2 at dep. pp. 13-14.) Dr. Casteel opined that a rabbit experiencing vomitoxicosis would exhibit gastrointestinal upset, diarrhea, feed refusal, and immunodepression, but he acknowledged that those symptoms are not unique to vomitoxin exposure. (*Id.* at dep. pp. 21-22.)

In sum, Dr. Casteel could not testify to what level of vomitoxin is toxic to rabbits or what caused Crane's rabbits' illnesses or deaths. Nor could he testify that the symptoms exhibited by Crane's rabbits were indicative of vomitoxin exposure rather than unrelated illnesses. An expert's equivocation on an alleged cause of injury where other causes are possible cannot constitute substantial evidence that a particular cause for which the defendant is liable is responsible for a plaintiff's injuries. *Bone*, 179 F.3d at 1081-82 (quoting *Kircher*, 775 S.W.2d at 117); *Sanders v. Hartville Mill. Co.*, 14 S.W.3d 188, 201 (Mo. Ct. App. 2000).

Although other evidence, including Dr. Casteel's testimony, shows that vomitoxin was present in samples taken from one bag of Feed, that evidence likewise does not constitute substantial evidence that the Feed caused the injuries Crane claims. First, while two samples of Feed from one bag yielded results showing vomitoxin at levels that could be harmful to some animals, none of the Feed from that bag was fed to Crane's rabbits before they showed signs of illness. And three other samples from that same bag of Feed yielded negative results for

- 15 -

the presence of vomitoxin.  None of the Feed that Crane gave to her rabbits before or at the time they started showed signs of illness was tested.  Moreover, in her complaint to ADM, Crane reported that her rabbits began showing signs of illness and experienced death beginning in November 2022 – one month before she purchased the Feed at issue.  There simply is no evidence that at or before the time Crane's rabbits became ill, they actually ate Feed that either contained vomitoxin or was contaminated with vomitoxin at levels harmful to rabbits.  *See Green*, 376 S.W.2d at 124 (plaintiff did not show that contaminated feed was actually fed to his chickens).

In addition, none of the necropsies showed the presence of vomitoxin or that the rabbits experienced toxin-induced illness or death.  Even the necropsies of those rabbits that were deliberately given Feed from the vomitoxin-positive bag did not report vomitoxin-related injuries, with the ISU vet lab specifically opining that "The cause of the reported morbidity and mortality is unlikely to have been caused by mycotoxins."  There is no evidence, let alone substantial evidence, that the rabbits' illnesses or deaths were a consequence of their eating the Feed.  *See Green*, 376 S.W.2d at 124.

To the contrary, substantial evidence shows that the causes of Crane's rabbits' illnesses and deaths for which ADM is *not* liable were at least equally probable, if not more probable, as the Feed.  No necropsy report identified

vomitoxin as a factor in the rabbits' disease process in any way. The ISU vet lab specifically reported that it was unlikely that mycotoxins caused the illnesses. Every report identified the presence of coccidia; and the MU vet lab concluded that that was the determinative factor for the rabbits' conditions, with its final diagnosis as coccidiosis. Dr. Lehenbauer, who reviewed the necropsy reports, likewise concluded that coccidia was the culprit, noting that Crane's rabbits appeared to suffer from a particular hepatic strain that caused continuing symptoms. Crane herself admits that coccidia was present at her rabbitry, that she last cleaned for coccidia in September 2022, and that she did not treat any of her rabbits for coccidia during the relevant time.

Moreover, Crane reported to ADM that rabbits began dying in November 2022, including rabbits at birth and within a few days of birth. (ECF 69-4 at hp. 64.) Based on Crane's own testimony that she keeps her rabbits with their mothers to consume their mother's milk until they are weaned at four or five weeks (ECF 69-1 at dep. pp. 66-68), it cannot reasonably be said that a rabbit's death at birth or within a few days would be caused by their consumption of manufactured feed. Crane also testified that her kits and rabbits have died in the past from coccidia, broken bones, weaning enteritis, etc., and that she usually lost one or two rabbits a week to such causes. (*Id.* at dep. pp. 33-34.) Although she asserts that the rate of illness and death increased beginning in late December 2022 after giving the Feed

to her rabbits, she does not identify how many rabbits died from that time through March 2023 from those non-toxin-related causes to which she had grown accustomed. Regardless, one must be mindful not to "confuse[] chronology with causality[.]" *Royal v. Advantica Rest. Grp., Inc.*, 194 S.W.3d 371, 377 (Mo. Ct. App. 2006).

The undisputed evidence before the Court shows significant levels of coccidia in the necropsied rabbits; that Crane experienced coccidia in her herd in the past; that Crane did not treat or clean for coccidia during the relevant period; that Crane previously experienced non-Feed related death in her herd, including from coccidia; that veterinarians opined that coccidia caused the rabbits' illnesses and deaths; that vomitoxin was not detected in any necropsied rabbit; and that no veterinarian or other expert opined that vomitoxin caused the death of any rabbit. Indeed, Crane's expert could not render an opinion as to the cause of death in Crane's rabbits. The undisputed evidence also shows that none of the vomitoxin-positive Feed was given to Crane's rabbits before Crane observed the rabbits' illnesses and, further, that the necropsies of those rabbits that were later deliberately given Feed from the vomitoxin-positive bag showed parasitic infection from coccidia and no evidence of toxin-induced disease.

Against this undisputed evidence, Crane's assertion that her rabbits became ill and died because they ate Feed contaminated with vomitoxin at levels harmful

to rabbits is based only on speculation and guesswork and not upon any admissible evidence in the case. Although Crane contends that her assertions are based on her own research, she neither identifies her research nor considers herself a scientist. (ECF 69-1 at, *e.g.*, dep. pp. 63-65, 101-03, 110-11.)[11] The most that can be said of Crane's evidence is that it establishes the possibility that her rabbits' illnesses and deaths may have resulted from her use of the Feed, "but the possibility of fault and causation is not sufficient to attach liability, where there are alternative possibilities under one of which defendant is liable and under the other of which there is no liability." *Green*, 376 S.W.2d at 126.

Because the evidence before the Court does not point to Crane's "desired conclusion with such a degree of certainty as to make that conclusion reasonable and probable," *Green*, 376 S.W.2d at 124, and there is no substantial evidence based on probative facts that feed manufactured and sold by ADM was responsible for Crane's claimed injuries, ADM is entitled to summary judgment on Crane's claims. *Bone*, 179 F.3d at 1081-82; *Kircher*, 775 S.W.2d at 117.

Accordingly, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that defendant Archer Daniels Midland Co.'s

---

[11] This includes Crane's unsupported assertion that the presence of vomitoxin caused immunosuppression in the rabbits, which she claims caused the coccidia to take hold. (*See* ECF 69-1 at dep. pp. 53-54, 62-64.) Notably, Dr. Casteel testified that there was no objective evidence of immunosuppression in Crane's rabbits other than that they were sick, and that merely because an animal is sick does not mean it is immunosuppressed. (ECF 69-2 at dep. pp. 28-29.)

Motion for Summary Judgment [67] is **GRANTED**, and Counts I and II of plaintiff Arla Crane's First Amended Complaint are dismissed with prejudice.

**IT IS FURTHER ORDERED** that defendant's Motion and Amended Motion to Continue Trial Date [86] [88] are **DENIED as moot.**

An appropriate Judgment is entered this date in accordance with this Memorandum and Order as well as the Memorandum and Order entered May 31, 2024, dismissing Count III of the First Amended Complaint.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 12th day of November, 2025.